IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

FREDRICK L. EVANS,
      Petitioner,

vs.                                  Case No.:  3:14cv114/MCR/EMT

JULIE L. JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 17).  The court provided Petitioner an opportunity to reply (*see* doc. 18), but he has not done so.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 17).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2003-CF-1316, with one count of trafficking in cocaine (28 grams or more, but less than 200 grams) (Count 1), and one count of sale, manufacture, delivery, or possession with

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 17).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

intent to sell, manufacture, or deliver cannabis (Count 2) (Ex. A). Petitioner pled nolo contendere to the charges, with no agreement with the State as to his sentence (Ex. B). On April 23, 2004, the court adjudicated him guilty and sentenced him on Count 1 to fifteen years in prison, with a three-year mandatory minimum term, and with pre-sentence jail credit of 396 days; however, the court ordered that after serving a period of four years in prison, the balance of Petitioner's sentence on Count 1 would be suspended, and he would serve a period of two years of probation (Ex. C). On Count 2, Petitioner was sentenced to four years of imprisonment, to run concurrently with the sentence on Count 1 and with pre-sentence jail credit of 396 days (*id.*).

After Petitioner served the incarcerative term of his sentence in Case No. 2003-CF-1316, and while he was on probation, Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2007-CF-829, with one count of sale, manufacture, delivery, or possession with intent to sell, manufacture, or deliver cocaine (Count 1), one count of possession of cannabis (more than 20 grams) (Count 2), and one count of possession of drug paraphernalia (Count 3) (Ex. D at 1). The State subsequently added a charge of failure to appear (Count 4), but then nolle prossed it (*id.* at 5, 59; *see also* Ex. J). A jury found Petitioner guilty as charged on all Counts (Ex. D at 47, Exs. E, F). The court adjudicated Petitioner guilty and sentenced him to ten years in prison on Count 1, a concurrent term of five years in prison on Count 2, and time served on Count 3, with presentence jail credit of 210 days (209 days on the VOP) (Ex. D at 51–64, Ex. J).

Petitioner was also charged with violating his probation ("VOP") in Case No. 2003-CF-1316 (Ex. H). Petitioner pled nolo contendere to the VOP (*see* Ex. I). The court found him guilty of the VOP, revoked his probation, and sentenced him to ten years in prison with presentence jail credit of 209 days, to run concurrently with his ten-year sentence on Count 1 of Case No. 2007-CF-829 (Ex. D. at 51–64, Exs. I, J).

Petitioner appealed the judgment in Case No. 2007-CF-829 to the Florida First District Court of Appeal ("First DCA"), Case No. 1D09-5354 (Ex. K). On November 1, 2010, the First DCA affirmed the judgment per curiam without written opinion (Ex. N). Evans v. State, 59 So. 3d 1156 (Fla. 1st DCA 2010) (Table). The mandate issued November 17, 2010 (Ex. O).

On December 30, 2010, Petitioner filed a motion for correction, reduction, or modification of sentence, pursuant to Rule 3.800(a) and (c) of the Florida Rules of Criminal Procedure (Ex. P).

On January 18, 2011, the state circuit court denied the motion to the extent Petitioner sought relief under Rule 3.800(c) as to Case No. 2007-CF-829, and dismissed it as untimely to the extent Petitioner sought relief under Rule 3.800(c) as to Case No. 2003-CF-1316 (Ex. Q).  The court dismissed the motion without prejudice to the extent Petitioner sought relief under Rules 3.800(a) and 3.850 (*id.*).

On May 5, 2011, Petitioner filed another Rule 3.800(a) motion (Ex. R at 1–4).  The state circuit court denied the motion in an order rendered September 19, 2011 (*id.* at 15–16).  Petitioner appealed the decision to the First DCA, Case No. 1D11-5985 (Ex. R at 35).  The First DCA affirmed the decision per curiam without written opinion on January 19, 2012, with the mandate issuing February 14, 2012 (Exs. S, T).  Evans v. State, 78 So. 3d 537 (Fla. 1st DCA 2012) (Table).

On June 28, 2012, Petitioner filed a petition for writ of habeas corpus in the First DCA, alleging ineffective assistance of appellate counsel, Case No. 1D12-3225 (Exs. U, V).  The court denied the petition on July 19, 2012 (Ex. W).  Evans v. State, 92 So. 3d 310 (Fla. 1st DCA 2012) (Mem).

On September 14, 2012, Petitioner filed a for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. X at 1–19).  The state circuit court struck the motion as facially insufficient with leave to amend (*id.* at 20–21).  Petitioner filed an amended motion (*id.* at 22–35, 38–53).  The state circuit court summarily denied the motion in an order rendered July 12, 2013 (*id.* at 54–151).  Petitioner appealed the decision to the First DCA, Case No. 1D13-4274 (*id.* at 157).  The First DCA affirmed the decision per curiam without written opinion on December 16, 2013, with the mandate issuing January 13, 2014 (Exs. Y, Z).  Evans v. State, 128 So. 3d 799 (Fla. 1st DCA 2013) (Table).

Petitioner filed the instant federal habeas action on March 5, 2014 (doc. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an

unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  See Gill, supra at 1291–92.  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  See Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011); see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see, e.g.,* <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); <u>Jones v. Walker</u>, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* <u>Gill</u>, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* <u>Panetti v. Quarterman</u>, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## III.    PETITIONER'S CLAIMS

A.    <u>Ground One</u>:  "Fundamental error and violation of the Due Process Clauses of the state and federal constitutions because Section 893.13(1)(a), 893.13(6)(1), 893.147(1), Florida Statutes (2007), and Section 893.135(1)(b)1.a., Florida Statutes (2003), as modified by Section 893.101, Florida Statutes (2003 and 2007), is unconstitutional on its face."

Petitioner contends the criminal statutes he was convicted of violating are facially unconstitutional because they have no mens rea requirement and create strict liability offenses (doc. 1 at 4–6). He asserts he presented this claim in his state habeas petition and his Rule 3.850 motion (*id.* at 6).

Respondent concedes Petitioner presented this claim in his Rule 3.850 motion (doc. 17 at 11–12). Respondent contends the state court's adjudication of the claim is not contrary to or an unreasonable application of clearly established federal law (*id.* at 11–14).

The state court record demonstrates that Petitioner presented this claim as Claim A in his Rule 3.850 motion (Ex. X at 8–10).[3] The state circuit court adjudicated the claim as follows:

> Defendant's first and second grounds for relief can be addressed together. In "Ground A," Defendant claims that section 893, Florida Statutes, is unconstitutional, and in "Ground B," he claims ineffective assistance of counsel for failing to raise this claim. Section 893 has specifically been found to be constitutional by State v. Adkins, 96 So. 3d 412 (Fla. 2012). Therefore, because a motion on this basis would not have been meritorious, counsel was not deficient for failing to raise this claim at trial. See Johnston v. State, 63 So. 3d 730, 740 (Fla. 2011) (counsel was not deficient for failing to file a meritless motion to suppress). Defendant is not entitled to relief on "Ground A" or "Ground B." Moreover, an attack on Defendant's convictions in case number 03-1316 would be untimely. See rule 3.850(b). See also Doctor v. State, 679 So. 2d 76 (Fla. 4th DCA 1996) (violation of probation does not extend time limitation to challenge original conviction).

(Ex. X at 55). The First DCA affirmed the decision (Ex. Y).

In Shelton v. Sec'y, Dep't of Corr., 691 F.3d 1348 (11th Cir. 2012), the Eleventh Circuit determined that there was no Supreme Court precedent clearly establishing that the Due Process Clause forbids the partial elimination of mens rea as an element of crimes analogous to those in Florida's Drug Abuse Prevention and Control Act, Florida Statutes Chapter 893; therefore, the Florida Supreme Court's decision in State v. Adkins, 96 So. 3d 412 (Fla. 2012) (the case upon which the state court relied in denying Petitioner's claim) was not contrary to or an unreasonable

---

[3] Petitioner also presented this claim to the First DCA in his state habeas petition (Ex. U at 8–19). The First DCA denied the claim on the merits (Ex. W). However, this adjudication occurred on July 19, 2012, prior to the First DCA's adjudication of the same claim on December 16, 2013, in the subsequent Rule 3.850 proceeding (Ex. Y). Because the First DCA's decision in the Rule 3.850 proceeding was the last state court adjudication of the merits of the federal claim, it is that adjudication that is reviewed under § 2254(d). *See* Hittson v. GDCP Warden, 759 F.3d 1210, 1231 (11th Cir. 2014) (citing Newland v. Hall, 527 F.3d 1162, 1198–99 (11th Cir. 2008)).

application of federal law.  Shelton, 691 F.3d at 1353, 1355.  Pursuant to Shelton, the state courts' rejection of Petitioner's due process challenge to the constitutionality of Florida's criminal drug statutes was not contrary to or an unreasonable application of clearly established federal law. Therefore, Petitioner failed to show he is entitled to federal habeas relief on Ground One.

> B.     Ground Two:  "Ineffective assistance of counsel in contravention of United States Constitutional Amendments 6 and 14 for failing to challenge Petitioner's drug offenses brought under Section 893.13(1)(a), 893.13(6)(a), 893.147(1), Florida Statutes (2007), and Section 893.135(1)(b)1.a., Florida Statutes (2003), as modified by Section 893.101, Florida Statutes (2003 and 2007), for facial unconstitutionality."

Petitioner contends his trial counsel was ineffective for failing to move to dismiss the drug charges on the ground that the state criminal statutes were facially unconstitutional for the reasons set forth in Ground One (doc. 1 at 7–9).  He states he presented this claim to the state courts in his state habeas petition and his Rule 3.850 motion (id. at 9).

Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (doc. 17 at 14–15).

> 1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  Id. at 687–88.  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. Id. at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305,  1313 (11th Cir. 2000)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.  Furthermore, "[e]ven if many reasonable lawyers

would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."  Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'"  Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, a petitioner's burden of demonstrating prejudice is high.  See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.

        2.      Federal Review of State Court Decision

Petitioner presented this issue as Claim B in his Rule 3.850 motion (Ex. X at 10–12).  The state circuit court determined that because a motion to dismiss challenging the facial constitutionality of the statute on due process grounds would not have been meritorious, counsel was not deficient for failing to raise such a challenge at trial (Ex. X at 55).  The First DCA affirmed the decision (Ex. Y).

Counsel is not ineffective for failing to raise a non-meritorious claim.  *See* Brownlee v. Haley, 306 F.3d 1043, 1046 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); Chandler v. Moore, 240 F.3d 907, 917–18 (11th Cir. 2001) (rejecting argument for ineffective assistance of counsel where counsel failed to raise a non-meritorious claim); Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for failing to make meritless motion); Jackson v. Herring, 42 F.3d 1350, 1359 (11th Cir. 1995) (counsel need not pursue constitutional claims which he reasonably believes to be of questionable merit).

Here, Petitioner failed to show that trial counsel had a meritorious basis for challenging the drug statutes on due process grounds (based upon the alleged absence of a mens rea element).  Therefore, he failed to satisfy either prong of the Strickland standard.  The state court's adjudication of Ground Two was not contrary to or an unreasonable application of clearly established federal law.

        C.      Ground Three:  "Ineffective assistance of counsel in contravention of United States Constitutional Amendments 6 and 14 for failing to move to suppress the Petitioner's confession and statements on basis that, and for failing to present evidence to the jury that, they were involuntary."

Petitioner alleges trial counsel was ineffective for failing to move to suppress his confession and statements to Detective Hubley on the ground that they were involuntary (doc. 1 at 9–15).  He also faults counsel for failing to present evidence to the jury that the statements were involuntary (*id.*).  He alleges law enforcement officers conducted a controlled drug buy at an apartment occupied by Shonda Thigpen (*id.*).  He alleges during the drug buy, a confidential informant purchased a small amount of cannabis from Thigpen (*id.*).  Petitioner alleges officers executed a search warrant and searched the apartment (*id.*).  He alleges officers found him, Thigpen, and contraband inside the apartment (*id.*).  Petitioner alleges Detective Hubley interviewed him, and he told Hubley that all of the contraband was his (*id.*).  Petitioner alleges Ms. Thigpen admitted that several bags of

cannabis located in a candle in the kitchen were hers  (*id.*).  Petitioner alleges he was arrested and transported to the local jail (*id.*).

Petitioner alleges he told Detective Hubley that the contraband was his, because Hubley threatened that if Petitioner refused to cooperate or give a statement or confession: (1) he would make sure Petitioner would immediately be arrested for as many law violations as possible, and unreasonable bonds would be set, (2) he would contact Petitioner's probation officer and recommend that his probation be violated, (3) Petitioner would not receive bond on the VOP case, and (4) Petitioner would receive the most severe penalty that he could convince the prosecutor and the trial court to impose on the new law violations (doc. 1 at 9–15).  Petitioner alleges his confession was also the result of promises made by Detective Hubley, specifically these: (1) Petitioner would be arrested only as a guise to fool on-lookers, (2) Petitioner's bond would be set at $2,000 on the new law violations, and he would receive cash to pay the bond, (3) he would contact Petitioner's probation officer and recommend that his probation not be violated, or that the VOP be postponed, (4) Petitioner would receive a reasonable bond on the VOP if Petitioner's probation officer filed a VOP, (5) Petitioner would receive the lowest possible sentence that Hubley could persuade the prosecutor and trial court to impose for the new law violations, (6) Petitioner would be given the cell phone and some of the cash confiscated during the search, and (7) Petitioner would be immediately released (*id.*).  Petitioner alleges he told his trial counsel about Hubley's threats and promises, and he also told counsel that (1) Hubley refused to accept Petitioner's declaration of innocence, (2) Petitioner felt pressured by Hubley to confess, (3) Petitioner eventually offered to cooperate against his better judgment, (4) Hubley set Petitioner's bond at $2,000, (5) Hubley released $200.00 of the $900.00 seized during the search to Petitioner for his bond payment, (6) Hubley gave Petitioner one of the cell phones that was seized during the search, and (7) as soon as he (Petitioner) had the chance, he "jumped bond" because he was unable to provide Hubley the assistance he demanded (*id.*).

Petitioner alleges Detective Hubley stated during his pre-trial deposition that Petitioner expressed interest in cooperating with law enforcement because Petitioner knew that his probation would be violated and he would probably be returned to prison, and he wanted to assist law enforcement in the hope of receiving a lesser sentence (doc. 1 at 9–15).  Petitioner alleges during

discovery, defense counsel received a copy of a "contract" between the City of Pensacola (Hubley) and Petitioner stating that a cell phone belonged to Petitioner and that $700.00 of the $900.00 seized during the search would be given to the law enforcement trust fund, but there was no mention of the disposition of the remaining $200.00 (*id.*).

Petitioner alleges Detective Hubley testified at trial that (1) he told Petitioner that Petitioner had a limited amount of time to cooperate with law enforcement, because his probation officer would soon pursue a VOP, (2) he only arrested Petitioner because the search of the apartment occurred in a high visibility area, and he did not want to tip off any potential on-lookers that Petitioner was possibly an informant, (3) he (Hubley) was responsible for setting Petitioner's bond, (4) he gave Petitioner a low bond, and (5) upon Petitioner's release from the jail, he returned Petitioner's cell phone to him (doc. 1 at 9–15).  Petitioner alleges the State offered no evidence of his guilt other than his confession (*id.*).

Petitioner contends defense counsel should have filed a pre-trial motion to suppress his confession on the ground that it was induced by threats and promises and thus involuntary (doc. 1 at 9–15).  He alleges counsel also should have presented evidence and argument to the jury that his confession was involuntary (*id.*).  Petitioner alleges defense counsel instead pursued the theory that Petitioner falsely confessed in order to receive a low bond on the new law violations (*id.*).  Petitioner alleges this strategy required him to testify, which exposed the jury to the fact that he was a six-time convicted felon, a misdemeanant for an act of dishonesty, a recent releasee from prison for a drug charge, a probationer at the time of his arrest for the new drug offenses, and the recipient of a suspended sentence that he did not want to serve (*id.*).  Petitioner alleges if defense counsel had challenged the confession as involuntary, it would have been suppressed by the trial court or rejected by the jury (*id.*).  Additionally, he would have been acquitted because there was no other evidence linking him to the drug distribution operation (*id.*).

Petitioner asserts he presented this claim in his state habeas petition and his Rule 3.850 motion (doc. 1 at 15).

Respondent did not address this claim in its answer.

       1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner presented this claim as Claim C in his Rule 3.850 motion (Ex. X at 44–51).  The state court adjudicated the claim as follows:

> Defendant's "Amended Ground C," which pertains only to case number 07-0829, claims that trial counsel was deficient for failing to file a motion to suppress Defendant's confession and statements made to Detective Hubley on the basis that they were involuntary, and for failing to argue to the jury that the statements should be disregarded because they were involuntary.  In order to determine if counsel was deficient for failing to file a motion to suppress or make this argument to the jury, this Court must consider whether the motion and argument would have been successful and made a difference in the outcome of the proceedings.

> Defendant claims that during his initial interview, Detective Hubley told Defendant:

>> that if he refused to cooperate, or give a confession and statements, he would assure, one, the Defendant's immediate arrest for as many law violations as possible and unreasonable bonds for each, two, a phone call to the Defendant's probation officer recommending that the Defendant be immediately violated, three, no bond on the violation of probation case, and four, the most severe penalty that he could convince the State and the trial court to impose against the Defendant.

> Defendant also states that conversely, Detective Hubley promised him that if he cooperated and made a confession:

>> 1) his arrest [would be] nothing more than a guise to fool any on-lookers; 2) a $2000.00 surety bond on any or all new law violations and the cash to pay for such; 3) a phone call to his probation officer recommending no violations, or, at a minimum, that the violation be postponed for as long as possible; 4) a reasonable bond on the violation of probation case if it were to arise; 5) the lowest possible sentence that he could persuade the State and trial court into imposing for any possible charge or charges that could not be disposed of by him; 6) a cellular phone and cash from the goods confiscated from the searched apartment; and 7) his immediate release.

Defendant further alleges that he made a confession due to pressure from Detective Hubley, and then agreed to cooperate with police. His bond was set at $2000.00, and Detective Hubley allowed him to use $200.00 recovered from the apartment to post bond. Defendant's cell phone was returned to him. Subsequently, Defendant "jumped bond" and "stayed on the run for several years."

A defendant's confession is considered involuntary and inadmissible if the defendant was promised some benefit or lack of repercussion in exchange for the confession. See Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (the defendant's confession was involuntary where, while surrounded in her apartment by three law enforcement officers, she confessed "only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'"). See also Spano v. New York, 360 U. S. 315, 322–23 (1959) (defendant's confession was involuntary where he was questioned "until almost sunrise" by a series of law enforcement officers and district attorneys who ignored the defendant's requests for counsel and played on his sympathies for a childhood friend.). In Samuel v. State, 898 So. 2d 233, 235 (Fla. 4th DCA 2005), the defendant's confession was found to be involuntary where the defendant was suspected of having committed between seven and nine robberies, but a law enforcement officer told Samuel that he was suspected in fifteen robberies and that if Samuel "discussed the five or six robberies, he would not charge him with the others." In Samuel, the Court held that the confession was involuntary because the defendant did not reveal the specifics of the robberies until after the officer's promise not to prosecute. Id. at 237.

By contrast, in Almeida v. State, 737 So. 2d 520, 524 (Fla. 1999), the Court held that informing a suspect of potential charges against him does not constitute a threat to prosecute or a promise not to prosecute if the suspect cooperates. Similarly, in Peterka v. State, 640 So. 2d 59, 67 (Fla. 1994), the defendant's consent was found to be voluntary where the law enforcement officer "truthfully informed Peterka of the different degrees of homicide and that law enforcement was seeking to charge him with first-degree murder" and the record showed that the officer "made no promises of leniency in return for any statements, did not threaten Peterka, and did not use violence to induce the statements." A Court must evaluate the totality of the circumstances in order to determine whether a confession or consent was induced by threat or promise. See Wyche v. State, 987 So. 2d 23, 30–31 (Fla. 2008) (consent to give a saliva sample was found to be voluntary where police informed the defendant that he was suspected in a fictitious burglary when he was actually suspected of rape).

In the instant case, the trial testimony of Detective Hubley was riddled with objections, bench conferences, and motions for mistrial.[FN 3] Therefore, it is difficult to reconstruct the exact sequence of events on the morning in question based

on his testimony.   Additionally, the trial was held more than 30 months after Defendant's arrest because Defendant absconded after posting bond, and Detective Hubley admitted in his deposition that he could not recall the exact details of the incident.[FN 4]   It appears that police entered Defendant's cousin's apartment pursuant to a lawful search warrant, while Defendant and his cousin were inside.[FN 5]   Cocaine and marijuana were found in the apartment and Defendant and his cousin were advised of their <u>Miranda</u> rights.   At trial, Detective Hubley testified that Defendant admitted the drugs in the apartment belonged to him.   Then, as Detective Hubley described in his deposition:

> [Defendant] expressed interest in cooperating with law enforcement. He was on probation.  When he went to jail that day, he knew he was only going to have a short period of time before he was violated with his probation.   He expressed interest in cooperating with me to help— because he knew that once he got violated, he was probably going to go back to prison.   So he was interested in providing substantial assistance to lessen the time.

> [FN 3:  <u>See</u> Attachment 3, trial transcript excerpts, pp. 73–150 and pp. 236–243.]

> [FN 4:  <u>See</u> Attachment 4, excerpt of Detective Hubley's deposition.]

> [FN 5:  There was conflicting testimony at trial as to whether Defendant's cousin's children were present in the apartment.]

According to Defendant's trial testimony, after the police entered his cousin's apartment where he was staying, Defendant was placed in handcuffs and seated on the couch.[FN 6]  After Detective Hubley initially approached Defendant about the drugs found in the apartment, Defendant testified that he had told him, "ain't nothing in here mine," and "I ain't got nothing to tell you."   Defendant further testified that Detective Hubley had responded by saying, "Fine, I'm just going to arrest you with no bond."   About five to ten minutes later, Defendant had decided that he would cooperate in order to get a bond, and told Detective Hubley that he could assist with the arrest of another drug dealer.   Importantly, Defendant testified that he did not ever admit to Detective Hubley that any of the drugs in the apartment were his. Defendant admitted on cross-examination that he essentially made up a story in order to get a bond, although he never had any intention of cooperating.   He also testified that his cell phone and money to post the bond were returned to him.

> [FN 6:  <u>See</u> Attachment 3, trial transcript excerpts, pp. 213–235.]

First, the Court finds it problematic that Defendant claims that counsel should have made a motion to suppress a confession that Defendant denied ever making at trial.  Although Defendant states in the instant motion that he, in fact, "told Hubley that all contraband was his," he cannot now go behind his sworn trial testimony in a postconviction motion.  See generally Clift v. State, 43 So. 3d 778 (Fla. 1st DCA 2010); Stano v. State, 520 So. 2d 278, 280 (Fla. 1988).

Next, Defendant testified at trial as to his reasons for making the statements, and the issue of whether the statements were true or simply a ruse to get a bond was squarely before the jury.  Moreover, the jury was instructed:

> A statement claimed to have been made by the Defendant outside of court has been placed before you.  Such a statement should always be considered with caution and be weighed with great care to make sure it was freely and voluntarily made.  Therefore, you must determine from the evidence that the Defendant's alleged statement was knowingly, voluntarily and freely made.  In making this determination you should consider the total circumstances including but not limited to one, whether when the Defendant made the statement he had been threatened in order to get him to make it and two, whether anyone had promised him in order [sic] to get him to make it.  If you conclude Defendant's out of court statement was not freely and voluntarily made, you should disregard it.[FN 7]

Defense counsel also reiterated in closing arguments that the jury should consider whether Defendant had been threatened before making statements.[FN 8]

[FN 7:  See Attachment 3, trial transcript excerpts, p. 282.]

[FN 8:  See Attachment 3, trial transcript excerpts, p. 268.]

The Court also finds that the instant case lacks the aspect of deception found in many cases where statements were found to be involuntary.  Almost everything that Defendant claims that Detective Hubley told him was actually carried out: Defendant was given a low bond; the cash to post the bond; and his cell phone was returned to him.  Additionally, Detective Hubley's alleged statements to Defendant that his probation would be violated soon after his arrest and that he would be held with "no bond" on the violation of probation case was likely highly accurate advice.  As in Peterka, the Court does not find that when Detective Hubley truthfully informed Defendant of the consequences of his arrest, it rendered Defendant's subsequent statements involuntary.  640 So. 2d 59 at 67.  After considering the totality of the circumstances, the Court finds that Defendant's statements were voluntarily made after Defendant was advised of the reality of the situation,

Defendant reflected, and then made a decision to proceed as he deemed appropriate.[FN 9]  Defendant was certainly motivated to cooperate by the prospect of being allowed to bond out of jail, but that is the nature of agreements to assist police.  As Detective Hubley aptly stated in his deposition, "Confidential informants always have some sort of interest in giving information."[FN 10]

> [FN 9:  Furthermore, Defendant's statement that he was willing to assist police in order to be allowed to bond out of jail does not necessarily indicate that Defendant was guilty of possessing the drugs found in the apartment.]

> [FN 10:  See Attachment 4, deposition excerpts, p. 8.  Detective Hubley is referring [to] the confidential informant that [sic] provided the police with information that drugs were being sold from the apartment, which was the basis for the search warrant.]

Because the Court finds that Defendant's statements were voluntary, a motion to suppress on the basis that the statements were involuntary would not have been meritorious.  Furthermore, "[w]ith the aid of hindsight one can always second-guess the tactical judgments made by counsel, but it by no means follows that constitutional rights were infringed."  Long v. Brewer, 667 F.2d 742, 744 (8th Cir. 1982).  Accordingly, counsel was not deficient for failing to make a motion to suppress Defendant's statements.

Finally, although Defendant claims in the instant motion that the State presented no evidence of guilt other than his own statements at trial, Detective Miller testified that when he entered the apartment, Defendant was standing near a bedroom where the cocaine was found.[FN 11]  Although disputed by Defendant, evidence was presented that Defendant had been occupying that bedroom.  A bag of cocaine was also found on the floor next to where Defendant was standing when the police busted through the door.  Also contrary to Defendant's assertions, counsel argued to the jury that they should consider whether Defendant's statements were voluntary. The Court does not find that any further emphasis on this argument would have changed the outcome of the proceedings.  Defendant has not demonstrated that any inaction on the part of defense counsel arose to the level that would overcome the requisite strong presumption that counsel was acting reasonably according to his professional judgment.  "The likelihood of a different result must be substantial, not just conceivable."  Harrington v. Richter, 131 S. Ct. 770, 791–792 (2011) (citations omitted).

> [FN 11:  See Attachment 3, trial transcript excerpts, pp. 150–161.]

(Ex. X at 55–61).  The First DCA affirmed the circuit court's decision (Ex. Y).

In order to assess the reasonableness of defense counsel's failure to file a motion to suppress, consideration of the standard for suppressing a defendant's confession is necessary.  To determine whether a confession has been made "freely, voluntarily, and without compulsion or inducement of any sort," the court must examine the totality of the circumstances surrounding the confession. Withrow v. Williams, 507 U.S. 680, 688–89, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) (internal quotation and citations omitted).  This determination requires an inquiry, first, into whether the law enforcement officers informed the accused of his various constitutional rights as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966),[4] and if so, second, into whether, considering all of the surrounding circumstances, the statement was the product of the accused's free and rational choice.  Paxton v. Jarvis, 735 F.2d 1306, 1308 (11th Cir. 1984).

While the individual may knowingly and intelligently waive Miranda rights, unless such warnings and waiver thereof are demonstrated, no evidence obtained as a result of the interrogation may be used against the individual.  Miranda, 384 U.S. at 444.  For the waiver to be valid, the relinquishment of the right must have been voluntary in the sense that it was the product of a free individual choice rather than intimidation, coercion, or deception.  See Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986).  It also must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.  Id.  A court may properly conclude that Miranda rights have been waived "[i]f the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension. . . ."  Moran, 475 U.S. at 421 (citations omitted).

Unlike physical violence or the threat of it, which makes any resulting statement per se involuntary, the effect of psychological pressure or deception on the voluntariness of a statement depends on the particular circumstances in each case.  See Martin v. Wainwright, 770 F.2d 918, 925–26 (11th Cir. 1985), modified on other grounds, 781 F.2d 185 (11th Cir. 1986).  Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement

---

[4] In Miranda, the Supreme Court held that when an individual is in custody and subject to questioning, procedural safeguards must be employed to protect the privilege against self-incrimination.  384 U.S. at 444–45.  Prior to questioning, the individual must be advised of 1) his right to remain silent, 2) that anything he says can be used against him in a court of law, 3) that he has the right to the presence of an attorney, and 4) if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires.  Id. at 444.

involuntary.  *See, e.g.*, Frazier v. Cupp, 394 U.S. 731, 737–39, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (investigators falsely told defendant that a co-defendant had already confessed); Martin, 770 F.2d at 925 (same); United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984) ("[T]he police's use of a trick alone will not render a confession involuntary.").  Generally, courts have held statements involuntary because of police trickery only when other aggravating circumstances were also present, for example, where the deception took the form of a coercive threat, *see, e.g.*, Lynumn v. Illinois, 372 U.S. 528, 534, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963) (police falsely told defendant that the state would cut off welfare benefits and take her children away if she did not "cooperate") (cited, *supra*, by the state court); Rogers v. Richmond, 365 U.S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961) (confession involuntary where defendant confessed when police chief pretended that if defendant did not confess the defendant's ailing wife would be arrested); Spano v. New York, 360 U.S. 315, 323, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959) (police falsely told defendant that his close friend, who was a police officer, would lose his job if defendant did not make a statement) (cited, *supra*, by the state court); or where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them, *see, e.g.*, Hart v. Attorney Gen. of the State of Fla., 323 F.3d 884, 894–95 (11th Cir. 2003) (detective contradicted Miranda warnings by telling suspect that having a lawyer present would be a "disadvantage" and that "honesty wouldn't hurt him"); United States v. Beale, 921 F.2d 1412, 1435 (11th Cir. 1991) (agents told illiterate defendant that signing waiver form "would not hurt him").

"Even if some police tricks may be 'objectionable as a matter of ethics,' they are not relevant to the constitutional validity of a waiver unless they interfere with the defendant's 'ability to understand the nature of his rights and the consequences of abandoning them.'"  Farley, 607 F.3d at 1330 (quoting Moran, 475 U.S. at 423–24).  *Cf.* Martin, 770 F.2d at 925 (though some of the interrogation tactics were "distasteful," on balance they did not make defendant's confession involuntary).  Further, an officer's subjective motives are not relevant.  *See* Farley, 607 F.3d at 1330 (citing Moran, 475 U.S. at 423 (considering it "irrelevant" to voluntariness analysis whether misleading statement by police was intentional or inadvertent)).  The issue is whether the accused's decision to waive his rights was knowing and voluntary under the totality of the circumstances; therefore, the only relevant state of mind is that of the accused himself.  *See id.*

Under Florida law, an officer's promise that a defendant will not be prosecuted if he confesses will vitiate a confession. *See* State v. Favaloro, 424 So. 2d 47 (Fla. 3d DCA 1982) (officer impliedly promised that defendant would not be prosecuted if he consented to search); Brown v. State, 413 So. 2d 414 (Fla. 5th DCA 1982) (officer promised to drop two of the three charges and that defendant would receive five years of probation); Henthorne v. State, 409 So. 2d 1081 (Fla. 2d DCA 1982) (officer promised that if defendant disclosed identity of co-perpetrator, he would not be charged with two other armed robberies); Fillinger v. State, 349 So. 2d 714 (Fla. 2d DCA 1977) (officer threatened that defendant would be charged with another, unrelated crime, and promised to advise prosecutor of defendant's cooperation or lack thereof, and that her cooperation would be considered in seeking to establish the amount of bond).

Additionally, Florida courts have found a confession to be involuntary when an officer employs two or more courses of conduct or suspect statements against an accused, even though the conduct or statements, taken individually, might not vitiate the confession. *See, e.g.,* Brewer v. State, 386 So. 2d 232 (Fla.1980) (combination of officers' statements raising spectre of electric chair, their suggestions that they had power to effect leniency, and their suggestion to defendant that he would not be given a fair trial, constituted coercion); Gaspard v. State, 387 So. 2d 1016 (Fla. 1st DCA 1980) (officers' multiple interrogations over four-day period, lies regarding results of two polygraph tests, lie that child victim had been found dead, threat of death penalty, and accused's physical and psychological exhaustion, evidenced coercion); Hawthorne v. State, 377 So. 2d 780 (Fla. 1st DCA 1979) (officer's appealing to defendant's concern for her children, giving assurances of help in securing bond so she could be with them, and telling defendant that her children were being interrogated, that it was hard on them, and that her giving of a statement would eliminate the need for further questioning of her children, even though officer knew that defendant was represented by counsel and counsel advised her not to make a statement, rendered confession involuntary); Ware v. State, 307 So. 2d 255 (Fla. 4th DCA 1975) (officers' promise that if defendant confessed he would not be away form his family for as long but otherwise someone else would have to raise his children, together with defendant's lack of response when asked whether he understood his Miranda rights, defendant's signing of Miranda card without explanation as to the effect of his

doing so, and defendant's requesting attorney after making oral confession and prior to making recorded confession, rendered confession involuntary).

However, courts distinguish between improper police techniques that are "calculated to exert improper influence, to trick, or to delude the suspect as to his true position," and proper police statements of relevant facts.  Thomas v. State, 456 So. 2d 454, 458 (Fla. 1984).  A statement is not rendered involuntary if officers inform a suspect of realistic penalties, encourage the suspect to tell the truth, or tell the suspect that things would be easier if the suspect told the truth.  *See, e.g.,* Fare v. Michael C., 442 U.S. 707, 727–28, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979) (mere indication by police that "a cooperative attitude would be to respondent's benefit" was not sufficient to find the police coerced a waiver of Miranda rights); Frazier v. State, 107 So. 2d 16, 22 (Fla.1958); Nelson v. State, 688 So. 2d 971, 974 (Fla. 4th DCA 1997); Hawkins v. Wainwright, 399 So. 2d 449 (Fla. 4th DCA 1981).

In this case, in assessing whether to file a pre-trial motion to suppress, defense counsel would have reasonably relied upon Detective Hubley's deposition testimony as the expected substance of his testimony at a pre-trial suppression hearing.  During his deposition, Detective Hubley stated that after officers entered Shonda Thigpen's apartment to execute a search warrant, Hubley separated Petitioner from Ms. Thigpen and individually advised each of them of his/her Miranda rights (Ex. G at 125–26).  Hubley stated:

>       A.       He [Petitioner] expressed interest in cooperating with law enforcement.  He was on probation.  When he went to jail that day, he knew he was only going to have a short period of time before he was violated with his probation.  He expressed interest in cooperating with me to help—because he knew once he got violated, he was probably going to go back to prison.  So he was interested in providing substantial assistance—
>
>       Q. [by defense counsel]  What happened?
>
>       A.       —to lessen the time.  He took off.
>
>       Q.       What do you mean?
>
>       A.       He got—he bonded out of jail, and then we called him twice, and I didn't hear from him for three years until he got arrested the other day, or in February—two years, . . . .

Q.      So he never provided any substantial assistance?

A.      No.

Q.      What about his statement they were his drugs?  I mean—

A.      When we up front—

Q.      —in his demeanor, I mean, did he seem to really be claiming they were his or just—

A.      Yeah.

Q.      —or was he covering for Thigpen?  I know you can't get in somebody's mind.  I'm just trying to get a—

A.      No.  I—when we first talk to someone and they're interest is to cooperate—
. . . .
A.      —they have to fully disclose to me their total involvement in everything.  If they lie about one thing, they're going to lie to me down the road.
. . . .
A.      So when I first talked to him—

Q.      So you wanted to see—you were going to—

A.      Yes, and he told me he sold drugs.  He didn't have a job.  He just got out of prison.  He was selling the dope to support himself, to support her, and he didn't want to get her in trouble and get her kicked out of her apartment at the Village.

(Ex. G at 132–34).  Detective Hubley stated that Petitioner told him that the cocaine and the "larger quantity" of marijuana were his (*id.* at 126).  Hubley stated Petitioner also told him that he was staying in the bedroom where police found cocaine and marijuana, and Petitioner admitted that his cell phone was lying on the bed, plugged in next to a tin can containing marijuana and cocaine (*id.* at 127, 138–41).  Hubley testified that officers seized several cell phones, including the one found in the bedroom (*id.* at 139).

In Petitioner's state and federal post-conviction applications, Petitioner does not allege he would have testified at a pre-trial suppression hearing, nor does he allege the substance of any

testimony he would have provided.  Instead, he alleges only what he allegedly told defense counsel regarding the circumstances of his confession.  Petitioner did, however, testify at trial.  He testified to the following regarding the circumstances of his confession:

> Q [by defense counsel].  About how long after you were placed on the sofa was it that he [Detective Hubley] talked to you?
>
> A.      I would say it was about 20 or 30 minutes after they started searching the house and all that then he bumped into the cocaine in the hallway.  He was like you was right there, that is yours and I was like, ain't nothing in here mine.  So that is what he went on about.  He was like look, came at me with the cooperation question.  So I was like, I ain't got nothing to tell you.  Fine, I'm just going to arrest you with no bond.
>
> Q.      And then did that conversation end at that point and/or did it continue?
>
> A.      It continue.
>
> Q.      What was said next?
>
> A.      It didn't continue instantly.  Another five minutes went by.  I'm still sitting on the couch with Shonda.
> . . . .
> Q.      So five minutes later what happened?
>
> A.      I tell Shonda I don't want to be locked up with no bond so I'm going to tell them that I'm cooperate [sic] to try to get me a bond.
>
> Q.      What happened after you talked to Shonda what happened next?  Who did you talk to then?
>
> A.      Then I called him back up there and then that is when we went to the room and talked.
>
> Q.      Who is we?
>
> A.      Me and Mr. Hubley.
> . . . .
> Q.      And what was discussed between you and Mr. Hubley and in that room?

A.      I pretty much don't recall because, you know, to be honest I came up with a scenario that I felt like he would believe to get me a bond.

. . . .

Q.      Now you were on probation at that time, right?

A.      Yes, sir, I was.

Q.      Okay.  And whether you are guilty or not what can an arrest do to your probation?

A.      Violate me.

Q.      So what are the concerns sometimes you might have on violation of probation?  Do you always get a bond for that?

A.      No, sir, you don't.

. . . .

Q.      You wanted to get a bond?

A.      Yes.

Q.      And you indicated you gave Hubley a scenario?

A.      Yes, I did.

Q.      What was the scenario you gave him?

A.      It wasn't no [sic], I didn't tell him that I knew somebody in the village that sell dope or nothing like that with no apartment numbers.  I just basically told him I say look, it be one guy, he get out Monday, he go to the side park and he meet another guy.  I told him that I would let him know when everybody be over there.  So he went for it.

Q.      Now, you had $900 on you; is that correct?

A.      Yes.

Q.      Where did that $900 come from?

A.      It came from checks that I had been saving.

Q.      What kind of money did you make working at Dalton?

A.      I made in between $400 or $500 weekly.

Q.      Now, this all happened on February 16, 2007; is that correct?

A.      Yes, sir.

. . . .

Q.      Did you get any money back from Detective Hubley on February 16th?

A.      Yes, which was the same day.

Q.      So that document with respect to the $900 was dated February 16th 2009?

A.      Yes, sir.

Q.      It is not dated February 17th?

A.      No, sir.

Q.      So you met with Detective Hubley to get some of the money back on February the 16th?

A.      After he apprehended me I never did leave him.  He gave me the money then for supposing to be bond that he gave me and I ain't seen him no more since then.

Q.      It happened the same day?

A.      It happened all with the arrest.

Q.      Sir, did any of the drugs that were found in that house belong to you?

A.      No, sir.

. . . .

Q.      Did you ever tell Detective Hubley that all the drugs in the house were yours?

A.      No, I didn't.  They assumed.

Q.      You didn't deny.  At one point did you say that certain drugs weren't yours?

A.      I didn't tell them nothing was mine.

Q.      When he came out and you indicated you responded to that statement?

A.      What?

> Q.       He came out earlier to you on the sofa and made a comment about finding drugs and accusing the drugs were yours.  Did he do—
>
> A.       Oh, yeah.  When they found the drugs in the hallway.
>
> Q.       And what was your response then?
>
> A.       I told him ain't nothing in there mine.
>
> Q.       So you did make that denial at that point?
>
> A.       Yes, sir.

(Ex. F at 222–29).

On cross-examination, Petitioner testified he told Detective Hubley that he would cooperate, and he told a fabricated story, because of Hubley's "threat" and in order to get a low bond (Ex. F at 231, 233–34).  Petitioner testified that Hubley gave him a low bond on the new law violations (*id.* at 233, 235).  He also testified that police returned a white cell phone to him, which officers seized from the kitchen of the apartment (*id.* at 235).

At Petitioner's trial, Detective Hubley testified that after he read Petitioner his <u>Miranda</u> rights, and Petitioner agreed to talk to him, he explained to Petitioner that officers found cocaine (Ex. E at 92–93, 100).  Hubley testified:

> Mr. Evans had stated he was on probation and that his being arrested for this new charge would violate his probation and that and [sic] I discussed this with him that he a [sic] violation of probation was going to be coming probably from his probation officer and that he had a limited amount of time in which to offer assistance for this new charge being the violation of probation was going to come out very shortly thereafter.

(Ex. F at 240).  Hubley testified that Petitioner expressed his willingness to cooperate with law enforcement and provide "some substantial assistance in regards to what we had found" (Ex. E at 100).  Hubley testified he told Petitioner that he needed to be truthful about what was found in the apartment, "because if he's going to lie to me at the beginning he'll lie to me later on and I needed to find out exactly what his involvement was" (*id.* at 104).  Hubley testified Petitioner stated that the cocaine in the apartment was his, and the marijuana that was found in a closet was also his (*id.*).  Hubley testified that Petitioner told him he was selling the cocaine in the apartment complex (*id.*).

Hubley further testified that Petitioner told him he had been living in Shonda Thigpen's apartment for several weeks (*id.*).  Hubley testified that officers seized $900.00 from the apartment, and Petitioner claimed that the money was his (*id.* at 105).  Hubley testified that Petitioner signed a Pensacola Police Department forfeiture form in which he claimed ownership of the $900.00, and agreed that $700.00 would be paid to a law enforcement trust fund (*id.* at 113).  That document was admitted into evidence (*id.*; *see also*, Ex. D at 100).  Hubley testified that even though Petitioner agreed to cooperate with law enforcement, he arrested Petitioner because it was a high visibility area, and everyone would know that Petitioner was cooperating with law enforcement if he did not go to jail (Ex. E at 117).  However, Hubley testified that he was responsible for setting Petitioner's bond, and he gave him a low bond so that Petitioner could get out of jail quickly and being cooperating (*id.* at 117, 240).  Hubley testified that Petitioner quickly bonded out of jail and came to the police department the next day (*id.* at 117).  Hubley testified that he returned a black cell phone to Petitioner that was found in the bedroom of the apartment, because Petitioner stated that his drug contacts were in the phone (*id.* at 117–18, 240; *see also* Ex. D at 90).

"Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.  As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Id.* (citations omitted).

Considering the evidence before the state court, it was not unreasonable for the state court to conclude that defense counsel was not ineffective for failing to file a pre-trial motion to suppress.  As discussed *supra*, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers, 13 F.3d at 386.  Counsel's performance

is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293.  Here, there was no evidence of a quid pro quo (i.e., a promise that charges for the new law violations would not be filed if Petitioner confessed), unfulfilled promises, physical or psychological coercion, or that Petitioner misunderstand the nature of the rights he waived or the consequences of his decision to abandon them.   Pared to its essence, Petitioner's testimonial version of the circumstances of his confession was that Hubley "came at me with the cooperation question"; Petitioner told Hubley "I ain't got nothing to tell you"; Hubley responded that he was going to arrest Petitioner with no bond; Petitioner knew he was facing a VOP and that he may not get bond on the VOP; five minutes elapsed while Petitioner sat on the couch with Shonda; Petitioner told Shonda he did not want to be locked up with no bond, so he was going to tell police that he would cooperate to try to get a bond; Petitioner called Hubley back into the room; he and Hubley went to another room; and Petitioner relayed "a scenario that I felt like he would believe to get me a bond," specifically, that he knew where and when a drug deal was to take place, and he would notify Hubley "when everybody be over there."  Hubley's testimonial version was that Petitioner said he was on probation and that his arrest for a new charge would violate his probation; Hubley told Petitioner that a VOP was probably going to be coming from his probation officer and that he had a limited amount of time in which to offer assistance to law enforcement on the new charge; and Petitioner expressed interest in cooperating with Hubley to help lessen his penalty on the VOP.

The evidence before the state court did not show that defense counsel's failure to file a motion to suppress was "outside the wide range of professional competence."  Nor did the evidence show a reasonable probability that the trial court would have properly granted a motion to suppress, or that the outcome of Petitioner's trial would have been different if counsel had attempted to suppress the confession.   Therefore, the state court's adjudication of this claim was not an unreasonable application of Strickland.

With regard to Petitioner's claim that defense counsel should have presented evidence and argument to the jury that his confession was involuntary, the state court found as fact that counsel did argue to the jury that they should consider whether Petitioner's statements were voluntary. Further, the state court reasonably concluded that Petitioner failed to show a reasonable probability that any further emphasis on this argument would have changed the outcome of trial.  The same is

true of Petitioner's contention that defense counsel was ineffective for failing to present "evidence" of involuntariness. The only "evidence" Petitioner identified was a copy of the forfeiture agreement signed by Petitioner and Detective Hubley providing that $700.00 of the $900.00 seized during the search would be given to the law enforcement trust fund and with no mention of the disposition of the remaining $200.00. However, the jury heard testimony regarding the agreement, and the agreement itself was admitted into evidence (*see* Ex. D at 100). Any additional evidence would have been cumulative.

Petitioner failed to demonstrate that the state court's adjudication of his ineffective assistance of counsel claim was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to federal relief on Ground Three.

> D. <u>Ground Four: "Ineffective assistance of appellant [sic] counsel in contravention of United States Constitutional Amendments 6 and 14 for failing to challenge Petitioner's drug offenses brought under Section 893.13(1)(a), 893.13(6)(a), 893.147(1), Florida Statutes (2007), and Section 893.135(1)(b)1.a., Florida Statutes (2003), as modified by Section 893.101, Florida Statutes (2003 and 2007), for facial unconstitutionality."</u>

Petitioner contends his counsel on direct appeal was ineffective for failing to argue that the state criminal drug statutes were facially unconstitutional for the reasons set forth in Ground One, *supra* (doc. 1 at 15–20). He states he presented this claim to the state courts in his state habeas petition (*id.* at 20).

Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (doc. 17 at 15–16).

> 1. Clearly Established Federal Law

The standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). *See* <u>Smith v. Robbins</u>, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 746 (2000) (citation omitted). The two components of an ineffectiveness claim under <u>Strickland</u> are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. <u>Strickland</u>, 466 U.S. at 697. The focus of inquiry under the performance prong of <u>Strickland</u> is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691. Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order

to maximize the likelihood of success of on appeal.  Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  To demonstrate prejudice, petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, petitioner would have prevailed on appeal.  *See* Robbins, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the Strickland standard with regard to claims of ineffective assistance of appellate counsel.  Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit."  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)).  Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  Diaz v. Sec'y Dep't of Corrs., 402 F.3d 1136, 1142 (11th Cir. 2005); Atkins v. Singletary, 965 F.2d 952, 957 (11th Cir. 1992); Francois v. Wainwright, 741 F.2d 1275, 1285–86 (11th Cir. 1984).  Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal.  Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir.1988)).

2.     Federal Review of State Court Decision

Petitioner raised this claim in his state habeas petition (Ex. U at 19–25).  The First DCA denied the claim, citing State v. Adkins, 96 So. 3d 412 (Fla. 2012) (Ex. W).

For the reasons discussed *supra* in Grounds One and Two, the state court's adjudication of this claim is not contrary to or an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to federal relief on Ground Four.

IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>12th</u> day of March 2015.


<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**